[Crim. No. 7014. In Bank. Oct. 25, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT KARL SIDENER, Defendant and Appellant.

Ellery E. Cuff, Public Defender, Fred Kilbride and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, J.—Defendant appeals from a judgment of conviction on an information charging him with possession of a narcotic (heroin) in violation of Health and Safety Code section 11500. The trial court also found to be true the charge that defendant had been convicted of violating the same section in 1955.   At the hearing on probation and sentencing the trial judge refused to consider dismissal of the charge of prior conviction on the ground that the district attorney had made no motion for dismissal as required by

Health and Safety Code section 11718.[1] Probation was denied (Health & Saf. Code, § 11715.6) and defendant was sentenced to an increased term as a second offender. (Health & Saf. Code, § 11500.)

The Legislature has determined that recidivists should be punished more severely than first offenders (e.g., Pen. Code, §§ 644, 1203, 3020, 3024, 3047-3048.5; Health & Saf. Code, §§ 11500, 11501, 11502, 11530, 11531, 11532, 11540, 11557, 11715.6) and has directed that charges of recidivism in narcotics cases shall not be dismissed except upon motion of the district attorney.

Defendant contends that the power to dismiss such charges is vested exclusively in the courts by article VI, section 1[2] and article III, section 1[3] of the California Constitution, and that Health and Safety Code section 11718 is therefore invalid. This contention is unsound. Any statements or implications in *People* v. *Burke,* 47 Cal.2d 45, 52 [301 P.2d 241], and *People* v. *Valenti,* 49 Cal.2d 199, 206 [316 P.2d 633], to the contrary were not necessary to the holdings in those cases and are disapproved.

In section 11718 the Legislature has adopted part of the prosecutor's common-law power of nolle prosequi, which included the power to strike allegations that would increase punishment. (*State of Maine* v. *Burke,* 38 Me. 574, 575; *Anonymous,* 31 Me. 590; *Commonwealth* v. *Tuck,* 37 Mass. (20 Pick.) 356, 364-367; *Commonwealth* v. *Briggs,* 24 Mass. (7 Pick.) 177, 178-179; *Baker* v. *State of Ohio,* 12 Ohio St. 214, 217-218.) That power, hundreds of years old[4] and

[1] ''In any criminal proceeding for violation of any provision of this division no allegation of fact which, if admitted or found to be true, would change the penalty for the offense charged from what the penalty would be if such fact were not alleged and admitted or proved to be true may be dismissed by the court or stricken from the accusatory pleading except upon motion of the district attorney.''

[2] ''The judicial power of the State shall be vested in the Senate, sitting as a court of impeachment, in a Supreme Court, district courts of appeal, superior courts, municipal courts, and justice courts.''

[3] ''The powers of the Government of the State of California shall be divided into three separate departments—the legislative, executive, and judicial; and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to either of the others, except as in this Constitution expressly directed or permitted.''

[4] An incident related in 2 Campbell's Lives of the Chancellors 173 is of interest in this connection. After he had ordered the imprisonment of a group of fanatics called ''Prophets'' for seditious language, Lord Holt was visited by Lacy, one of their friends, who informed a servant that he

still recognized in many jurisdictions having constitutional provisions essentially identical with section 1 of article VI (*United States* v. *Brokaw* (D.C. Ill.) 60 F.Supp. 100, 101; *State* v. *Broussard*, 217 La. 90, 95 [46 So.2d 48]; *State* v. *Kearns* (Ohio Com. Pl.) 129 N.E.2d 543, 545; *State* v. *Charles*, 183 S.C. 188, 194 [190 S.E. 466]; see 69 A.L.R. 240, 241-243), was not abrogated by that section. The phrase "judicial power" cannot reasonably be given a meaning that it has never before been thought to have in this or any other state to invalidate an act of the Legislature. Courts are not the only public agencies constitutionally empowered to determine the punitive consequences of recidivism.

The contention that prosecutors have never had the common-law power of nolle prosequi in this state is based solely on the enactment at the first and second legislative sessions (Stats. 1850, ch. 119, p. 323; Stats. 1851, ch. 29, p. 279) of the predecessors of Penal Code sections 1385 and 1386.[5] Thus it was a legislative act, not a constitutional provision, that deprived prosecutors of such power in California. In the exercise of the same power by which the 1850 and 1851 Legislatures rejected nolle prosequi, the 1959 Legislature chose to restore it in part.

The fact that sections 1385 and 1386 were necessary to give to the courts this power traditionally vested in prosecutors demonstrates that the common-law rule was not abrogated by the general language of the Constitution vesting the "judicial power" in the courts.

The Legislature has never completely rejected the prosecutor's common-law power of nolle prosequi. The same Legisla-

carried a message "from the Lord God." Lacy was admitted and told Lord Holt: "I come to you a prophet from the Lord God, who has sent me to thee, and would have thee grant a *nolle prosequi* for John Atkins, his servant, whom thou hast cast into prison." Lord Holt replied: "Thou art a false prophet, and a lying knave. If the Lord God had sent thee it would have been to the Attorney-General, *for He knows that it belongeth not to the Chief Justice to grant a nolle prosequi; but I, as Chief Justice, can grant a warrant to commit thee to bear him company.*" (See Wharton, Criminal Pleading and Practice (9th ed. 1889) § 383, p. 268, fn. 2.)

[5] Section 1385 provides: "The court may, either of its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons of the dismissal must be set forth in an order entered upon the minutes. No dismissal shall be made for any cause which would be ground of demurrer to the accusatory pleading."

Section 1386 provides: "The entry of a nolle prosequi is abolished, and neither the attorney-general nor the district attorney can discontinue or abandon a prosecution for a public offense, except as provided in the last section."

ture that enacted the predecessors of section 1385 and 1386 in 1850 and 1851 also adopted the predecessor of Penal Code section 1099 which provides: "When two or more defendants are included in the same accusatory pleading, the court may, at any time before the defendants have gone into their defense, *on the application of the prosecuting attorney,* direct any defendant to be discharged, that he may be a witness for the people." (Italics added.) In *People* v. *Bruzzo,* 24 Cal. 41, this court was confronted with the question whether a court had authority without a motion for dismissal by the district attorney to dismiss a joint defendant so that he might become a witness for the people. The district attorney, as in the present case, had declined to move for dismissal. It was held that "The Court has no power to discharge Bruzzo at common law, nor under the Act of 1851, on the motion of his own counsel." (24 Cal. at p. 51.)

The *Bruzzo* case demonstrates that the power of dismissal is not vested exclusively in the courts, but may be given to the prosecutor by the Legislature. Health and Safety Code section 11718 gives the district attorney the same power with respect to dismissal of charges of recidivism in narcotics cases that Penal Code section 1099 gives him with respect to dismissal of charges against joint defendants. Both sections are a partial legislative adoption of the prosecutor's common-law power of nolle prosequi.

The *Bruzzo* case cannot be distinguished on the ground that dismissal of a charge of a prior conviction is effective only for sentencing purposes. The common-law power of nolle prosequi included dismissal of the prosecution entirely or any separable part thereof. Charges could be dismissed by entry of a nolle prosequi before the jury was impanelled, while the case was before the jury, or after verdict. (See Wharton, Criminal Pleading and Practice (9th ed. 1889) § 448, p. 313; 14 Am. Jur., Criminal Law, §§ 296-298, pp. 967-968; 22A C.J.S., Criminal Law, § 457a, pp. 3-4.)

The meaning of constitutional provisions, however, is not static, and the scope of judicial power is not found in history alone. The definition and classification of public offenses and the punishment therefor are legislative matters. (*Harbor Comrs.* v. *Excelsior Redwood Co.,* 88 Cal. 491, 493 [26 P. 375, 22 Am.St.Rep. 321]; *Ex Parte Cox,* 63 Cal. 21; *Moore* v. *Municipal Court,* 170 Cal.App.2d 548, 556 [339 P.2d 196].) If charges have not been dismissed pursuant to the authority granted by the Legislature, the court must pass sentence as

650

prescribed by statute (Pen. Code, § 12) and may not impose any sentence other than that prescribed. (*People* v. *Gonzales,* 36 Cal.App. 782, 784 [173 P. 407] ; see also Pen. Code, § 1203 et seq. relating to probation and suspension of sentences.)

The charge of a prior conviction in the present case has not been dismissed pursuant to legislative authority. The court found that the charge was true and was therefore bound to impose the sentence prescribed by law. The court could no more dismiss this charge without statutory authority than it could dismiss a charge against any defendant convicted of murder, arson, rape or any other crime. A court may feel that the punishment prescribed by the Legislature for a recidivist narcotics offender is too severe or that by dismissing one or more charges punishment can be imposed that would better serve to rehabilitate him. To dismiss the charges in the face of Health and Safety Code section 11718, however, would be a flagrant usurpation of legislative power and an arrogant affectation of wisdom in the matter of punishment and rehabilitation superior to that of the Legislature. Certainly article VI, section 1 and article III, section 1 do not endow courts with such power.

The fact that prior convictions are now given greater weight than they once were does not distinguish them from the host of other considerations of penology that are now given greater or lesser weight than they once were or compel the conclusion that their punitive effect is for the courts alone. Like premeditation or malice aforethought in homicide or bodily harm in kidnapping, prior convictions have been made operative facts for the determination of punishment. Every day prosecuting attorneys exercise broad powers in this respect. It is they who decide what crime is to be charged or if any crime is to be charged. (*Board of Supervisors* v. *Simpson,* 36 Cal.2d 671, 676 [227 P.2d 14] ; see Klein, *District Attorney's Discretion Not to Prosecute,* 32 L.A.B. Bull. 323-334; Note, *Private Prosecution: A Remedy for District Attorneys' Unwarranted Inaction,* 65 Yale L.J. 209; Remington & Joseph, *Charging, Convicting, and Sentencing the Multiple Criminal Offender,* 1961 Wis. L. Rev. 528, 530; Wright, *Duties of a Prosecutor,* 33 Conn. B.J. 293-295.) Moreover, it is only because the Legislature so directed that they are bound to charge all prior convictions (Pen. Code, § 969) once the decision to prosecute is made. It would exalt form over substance to hold that broad constitutional principles of separation of powers and due process of law permit vesting complete dis-

cretion in the prosecutor before the case begins, but deny him all such discretion once the information is filed.

There are innumerable facts other than the commission of the crime itself that may have far more bearing on the punishment imposed than prior convictions. If not only their existence but their effect on punishment must be determined solely by courts, the indeterminate sentence law and the legislative restrictions on the court's power to grant probation must fall. The indeterminate sentence law has been sustained, however, on the theory that a conviction carries with it judicially determined liability for the maximum sentence and that any remission from that maximum may be determined by an administrative agency (*In re Lee,* 177 Cal. 690, 692-693 [171 P. 958] ; *In re Wells,* 35 Cal.2d 889, 893 [221 P.2d 947] ; *In re Smith,* 33 Cal.2d 797, 804-805 [205 P.2d 662]), subject only to limited judicial review. (*In re McLain,* 55 Cal.2d 78, 87 [9 Cal.Rptr. 824, 357 P.2d 1080].) The Legislature could provide life imprisonment as the maximum term for all narcotics convictions without possibility of probation, and it could leave it solely to the Adult Authority to determine the punitive effect of prior convictions. It could set out standards to govern the Adult Authority and provide for judicial review of its findings with respect to relevant facts. It might, for example, provide that prior convictions should be determined, not at the trial but by the Adult Authority at a subsequent hearing subject to judicial review. Surely it could not reasonably be contended that in such a review proceeding the judicial power included not only a review of the facts, but the power to instruct the Adult Authority to ignore them.

The Legislature has been given express constitutional power to determine what officers, agencies or boards may exercise the power now exercised by the Adult Authority and the scope of such powers.[6] The Legislature is authorized to provide that part of the powers that might otherwise be exercised by the Adult Authority alone shall be exercised by district attorneys.

[6]Article X, section 1 (formerly section 7) of the California Constitution provides: ''The Legislature may provide for the establishment, government, charge and superintendence of all institutions for all persons convicted of felonies. For this purpose, the Legislature may delegate the government, charge and superintendence of such institutions to any public governmental agency or agencies, officers, or board or boards, whether now existing or hereafter created by it. Any of such agencies, officers, or boards shall have such powers, perform such duties and exercise such functions in respect to other reformatory or penal matters, as the Legislature may prescribe.''

In determining that the district attorney rather than the Adult Authority or the trial court shall have primary responsibility for determining the punitive consequences of recidivism in the individual narcotics case, the Legislature in the exercise of its constitutional power has simply chosen one public officer rather than another. Some judges may think they are best qualified to make this determination; some district attorneys may think they are; others may think that neither judges nor district attorneys should be entrusted with that responsibility. In section 11718 of the Health and Safety Code the Legislature has designated the district attorney as the officer that can best effect the public policy of the state. ■ " '[I]t is not our concern whether the Legislature has adopted what we might think to be the wisest and most suitable means of accomplishing its objects.' " (*State of California* v. *Industrial Acc. Com.*, 48 Cal.2d 365, 372 [310 P.2d 7], quoting *City of Walnut Creek* v. *Silveira*, 47 Cal.2d 804, 811 [306 P.2d 453].)

The judgment is affirmed.

Gibson, C. J., Peters, J., and Tobriner, J., concurred.

SCHAUER, J., Dissenting.—In my view section 11718 of the Health and Safety Code[1] (both by its terms and as applied here during the trial of the defendant in the superior court on the felony charge of possessing a narcotic drug in violation of section 11500 of the same code) is unconstitutional under both the United States and California Constitutions in that it denies the defendant due process of law in the adjudication of material issues affecting probation and sentence (U.S. Const., 5th and 14th Amends.; Cal. Const., art. I, § 13). In particular, section 11718 has deprived the defendant at bench of his constitutional right to have a judicial officer (the trial judge) hear, and in the exercise of discretion vested exclusively in that officer determine, the important question of dismissal of a charge of a prior conviction (Cal. Const., art. VI, §§ 1, 5; Pen.

---

[1]Health and Safety Code section 11718, enacted in 1959, provides:

"In any criminal proceeding for violation of any provision of this division [*"Narcotics,"* §§ 11000-11797] *no allegation of fact* [in an indictment or information] which, if admitted or found to be true, would change the penalty for the offense charged from what the penalty would be if such fact were not alleged and admitted or proved to be true *may be dismissed by the court or stricken from the accusatory pleading except upon motion of the district attorney.*" (Italics added.)

Code, §§ 995, 1238, and 1385[2]) ; furthermore, by subjecting the exercise of an inherently judicial function to the unreviewable discretion of a member of the executive branch, the subject section violates the constitutional requirement of separation of powers (Cal. Const., art. III, § 1).

The general asseverations of the majority as to the powers of the Legislature to fix punishments for criminals, to differentiate among crimes and between first offenders and recidivists, and to prescribe the conditions for probation or parole, etc., are of course unquestioned. But the elaboration of such undoubted fundamentals should not be allowed to obscure the issue. Certainly the Legislature could absolutely prohibit the granting of probation or parole to anyone convicted of a narcotics (or any other) offense; or it could ordain any minimum and maximum terms it sees fit, or a mandatory life term without parole or even a nondiscretionary death penalty for such offenses. But the Legislature cannot—without transgressing our constitutional division of powers—transfer from the judicial to the executive branch of government the power either to grant or to deny, or to preclude judicial resolution of, a motion made prior to entry of judgment in a felony criminal action, the ruling on which will affect the substantial rights of the defendant under the judgment to follow.

Section 11718 actually goes farther than to transfer a seg-

---

[2]Section 1385 reads: ''The court may, either of its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons of the dismissal must be set forth in an order entered upon the minutes. No dismissal shall be made for any cause which would be ground of demurrer to the accusatory pleading.''

Section 995 defines certain situations (none of which, as such, is material here except as recognizing the inherent power of the court to act) wherein the ''indictment or information must be set aside'' upon motion of the defendant.

Section 1238 evidences implied powers of the trial court by providing that ''An appeal may be taken by the people:

''1. From an order setting aside the indictment, information, or complaint; . . .

''5. From an order made after judgment, affecting the substantial rights of the people;

''6. From an order modifying the verdict or finding by reducing the degree of the offense or the punishment imposed.''

It should be noted here (as is hereinafter in the text shown in more detail) that the power to control the cause—including the power to dismiss or to set aside an accusatory pleading or portion thereof—is not created by the mentioned code sections. That power stems from the Constitution and is merely regulated *procedurally* by the directives of the pertinent statute, such as, e.g., section 1385, requiring that the reasons for the dismissal of an action be set forth in an order entered in the minutes.

ment of the judicial power to the executive. It unquestionably purports to curtail the jurisdiction of the court by granting to the district attorney the unreviewable and absolute power (with no standard prescribed for its exercise) to preclude the judge from exercising any discretion in ruling on a motion in a criminal action for an order which would substantially affect the defendant's eligibility for probation, parole and the terms of his imprisonment. It bears reiteration that the Legislature, of course, *by general laws* can control eligibility for probation, parole and the term of imprisonment, but it cannot abort the *judicial process* by subjecting a judge to the control of the district attorney.

Section 11718 by its very terms tacitly recognizes—as under the Constitution is implicit—that the court has jurisdiction to entertain and pass on a motion for the relevant relief. But as to the judge's exercise of the court's jurisdiction in ruling on any such motion the statute directs that ''no allegation of fact [in an indictment or information filed with the court] which, if admitted or found to be true, would change the penalty for the offense charged from what the penalty would be if such fact were not alleged and admitted or proved to be true *may be dismissed by the court or stricken* from the accusatory pleading *except upon motion of the district attorney.*'' (Italics added.) Constitutional jurisdiction of the court to act cannot be turned on and off at the whimsy of either the district attorney or the Legislature. The power to act under our system of government means the power of an independent court to exercise its judicial discretion, not to servilely wait on the pleasure of the executive.

The majority summarize (*ante*, p. 646) the trial court's action on the question of dismissal of the charge of defendant's prior conviction, but fail to quote the following illuminating language of the trial judge:

''The Court: . . . Is there any legal cause why judgment should not be pronounced and sentence passed?

''Mr. Kilbride [deputy public defender] : I am in doubt—there is no legal cause other than I do not know yet what *the decision of the District Attorney was.*

''The Court: I will let that be made known to you at this time. The *District Attorney after due deliberation* has declined to initiate a motion to strike the prior conviction alleged. It [Health & Saf. Code, § 11718] therefore *ties the hands of this Court in which the Court has no discretion.*'' (Italics added.)

Accordingly, the court (deeming the subject statute to be

valid) did not in the exercise of its jurisdiction determine, but was compelled *by the district attorney's action* to deny, probation (Health & Saf. Code, § 11715.6 *post,* fn. 12) and to sentence defendant to state prison for an increased term (Health & Saf. Code, § 11500). The judge's action in imposing the increased term was compelled not by legislative determination that the longer term prescribed in section 11500 must in any event follow conviction of the offense, but only by the determination of the district attorney—*on no standard prescribed by law*—that as to this particular defendant *he* would preclude the court from exercising its discretion in a matter which otherwise was within the court's jurisdiction. In other words, the district attorney exercised *his absolute* discretion and section 11718 compelled the judge to abdicate the function of his office. In the next case to follow, before the same judge, the district attorney (again subject to no prescribed standard) might elect to permit *that defendant* to have the benefit of the judge's exercise of discretion on the same motion. Has the defendant here had due process and equal protection of the law?

The Legislature, of course, could have prescribed the longer punishment for conviction of the offense defined; but it could not transfer from the judicial to the executive—from the judge to the lawyer for the state—any part of the judicial power; nor could it create in the executive a totalitarian type of superpower to curb the judiciary. As declared by this court, unanimously, in *Vidal* v. *Backs* (1933) 218 Cal. 99, 104 [2] [21 P.2d 952, 86 A.L.R. 1134], "[W]e must bear in mind a fundamental principle of government applying to constitutional courts to the effect that they constitute an independent branch of government which cannot be *hampered or limited* in the discharge of its functions by either of the other two branches." (Italics added.)

Article VI, section 1, of the California Constitution provides that "The judicial power of the State shall be vested in the Senate, sitting as a court of impeachment, in a Supreme Court, district courts of appeal, superior courts, municipal courts, and justice courts." Section 5 of the same article specifies that "The superior courts shall have original jurisdiction in all . . . criminal cases amounting to felony. . . ." The criminal action against defendant, which was on trial in the superior court when the judge's power was curtailed by force of the district attorney's action in reliance on the statute, charged simple possession of a narcotic, a felony. Neither section 11500 nor

section 11718 of the Health and Safety Code distinguishes between simple possession by a sick addict and like possession by a nonaddict. A trial judge can—for obvious humanitarian reasons—make that distinction. It is this power of the trial judge to temper the universality of a harsh law which makes this case important to the cause of justice. It is important to the integrity of our constitutional government for reasons which will be more fully developed.

Significantly, neither in article VI nor elsewhere in the Constitution is there to be found a definition of the content of the phrase, ''The judicial power of the State,'' as used in section 1. It follows that a necessary corollary to that general language is the principle that ''Our courts are set up by the Constitution without any special limitations; hence the courts have and should maintain vigorously all the inherent and implied powers necessary to properly and effectively function as a separate department in the scheme of our state government.'' (*Brydonjack* v. *State Bar* (1929) 208 Cal. 439, 442 [1] [281 P. 1018, 66 A.L.R. 1507].) The latter principle was described by this court as long ago as 1929 as being ''now undebatable'' (*id.* at p. 442); the integrity of this holding has heretofore been continuingly respected (see, e.g., *Garrison* v. *Rourke* (1948) 32 Cal.2d 430, 436 [3] [196 P.2d 884]; *Kirstowsky* v. *Superior Court* (1956) 143 Cal.App.2d 745, 753 [6] [300 P.2d 163]).

The implied powers of a constitutionally created court are those which are necessary to enable it to properly and effectively exercise the fundamental judicial power granted by article VI, section 1. ''A court set up by the Constitution has within it the power of self-preservation, indeed, the power to remove all obstructions to its successful and convenient operation.'' (*Millholen* v. *Riley* (1930) 211 Cal. 29, 33 [4] [293 P. 69]; *Rivas* v. *County of Los Angeles* (1961) 195 Cal.App. 2d 406, 409-410 [2] [15 Cal.Rptr. 829]; *Arc Investment Co.* v. *Tiffith* (1958) 164 Cal.App.2d Supp. 853, 856 [7] [330 P.2d 305].) Certain of these implied powers have received legislative definition;[3] but in each instance the enactment neither created nor circumscribed the powers thus defined. Thus, as

---

[3]Code of Civil Procedure section 128 provides:

''Powers respecting conduct of proceedings. Every court shall have power:

''1. To preserve and enforce order in its immediate presence;

''2. To enforce order in the proceedings before it, or before a person or persons empowered to conduct a judicial investigation under its authority;

hereinabove noted in footnote 2, the provision of Penal Code section 1385 that "The court may, either of its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed" is not a *grant* of jurisdiction to dispose in a particular way of the actions pending before it. The court, by virtue of the constitutional provisions above mentioned, already has the complete power to fully adjudicate and, subject only to *judicial* review, finally dispose of, all causes encompassed in the constitutional grant. The additional language in section 1385 ("The reasons of the dismissal must be set forth in an order entered upon the minutes. No dismissal shall be made for any cause which would be ground of demurrer to the accusatory pleading.") obviously does not limit the jurisdiction or power of the court to control the justice of the cause but relates only to procedural matters. The essentially inherent or implied powers of the court are by their nature impracticable if not impossible of all-inclusive enumeration.[4]

---

"3. To provide for the orderly conduct of proceedings before it, or its officers;

"4. To compel obedience to its judgments, orders, and process, and to the orders of a judge out of court, in an action or proceeding pending therein;

"5. To control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter appertaining thereto;

"6. To compel the attendance of persons to testify in an action or proceeding pending therein, in the cases and manner provided in this code;

"7. To administer oaths in an action or proceeding pending therein, and in all other cases where it may be necessary in the exercise of its powers and duties;

"8. To amend and control its process and orders so as to make them conformable to law and justice."

Code of Civil Procedure section 177 provides:

"Powers of judicial officers as to conduct of proceedings. Every judicial officer shall have power:

"1. To preserve and enforce order in his immediate presence, and in proceedings before him, when he is engaged in the performance of official duty;

"2. To compel obedience to his lawful orders as provided in this code;

"3. To compel the attendance of persons to testify in a proceeding before him, in the cases and manner provided in this code;

"4. To administer oaths to persons in a proceeding pending before him, and in all other cases where it may be necessary in the exercise of his powers and duties."

*This fact is implicitly recognized, in one context, in Code of Civil Procedure section 187:

"Means to carry jurisdiction into effect. When jurisdiction is, by the constitution or this code, or by any other statute, conferred on a court or judicial officer, all the means necessary to carry it into effect are also given; . . ."

The majority, trying to find support for the Legislature's attempt to empower the executive to curtail the superior court's jurisdiction in the premises, say that "In section 11718 the Legislature has adopted part of the prosecutor's common-law power of nolle prosequi, which included the power to strike allegations that would increase punishment." (*Ante,* p. 647.) In so stating, the majority purport to proceed from the undocumented assumption (*ante,* pp. 647-648) that in California the common law power of nolle prosequi "was not abrogated by" the adoption of article VI, section 1, of our Constitution. But the majority neglect to point out that historically the *common-law doctrine of nolle prosequi appears never to have been in force in California.* It is not shown to have been a part of the Mexican law nor was it ever enacted by the Legislature or otherwise adopted by the People. As the majority appear to have overlooked these facts, a short excursion into legal history is necessary to demonstrate this proposition.

California, as a governmental entity, is not of common-law ancestry. At the time of the first influx of American settlers in the early 1840's the operating judicial system was Mexican. That system appears to have been rudimentary at best in the southern portion of the province and nonexistent in the north. (See Mason, *Constitutional History of California,* in Constitution of the State of California and Other Documents (1961, Calif. State Senate), p. 319; Wilson, *The Alcalde System of California* (1852), in 1 Cal. 559, 574-575.) However, to the extent that any laws of the central government of Mexico were in fact observed in California, the province was governed by the Constitution of 1837 and the laws of March 20 and May 23 of the same year.[5] An examination of the law of May 23, relating to the organization and jurisdiction of the courts, the duties and powers of the Attorney General, and civil and criminal procedure, reveals no provision authorizing the Attorney General to exercise any power resembling nolle prosequi under the common-law. And it may well be doubted that a custom to that effect existed, in view of (1) the traditional civil-law emphasis on the authority of the magistrate, and (2) the necessarily broad powers exercised by the alcaldes and

[5]The latter enactments are set forth in relevant part in Halleck, Translation and Digest of such portions of the Mexican Laws of March 20th and May 23d, 1837, as are supposed to be still in force and adapted to the present conditions of California (1849), reprinted in Browne, Debates in the Convention of California (1850), Appendix, pp. XXIV-XL.

justices of the peace in meting out the primitive justice of a remote and troubled province.[6]

Neither the proclamation of the California (Bear Flag) Republic on June 14, 1846, nor the military conquest and occupation of California beginning July 7, 1846, nor the ultimate cession of California to the United States by the Treaty of Guadalupe Hidalgo (February 2, 1848) operated to abrogate existing local law. Although many of the American settlers conducted their personal and business affairs by the only guides they knew—the rules and customs of the common law—they did so out of necessity and without authorization of any governing body. By established principles of international usage, when conquered or ceded territory is transferred to a new sovereign "the law, which may be denominated political, is necessarily changed, although that which regulates the intercourse, and general conduct of individuals, remains in force, until altered by the newly created power of the state." (*American Insurance Co.* v. *Canter* (1828) 26 U.S. (1 Pet.) 511, 542 [7 L.Ed. 242] [Louisiana] ; accord, *Cross* v. *Harrison* (1853) 57 U.S. (16 How.) 164, 198 [14 L.Ed. 889] [California].)

The fact that existing Mexican municipal law remained in force in California to the extent that it was not in conflict with the Constitution or laws of the United States, was repeatedly recognized during the subject period. It was asserted, for example, in the proclamation of General Kearny (March 1, 1847) taking command of the military government of California under orders of President Polk; in the proclamation of Colonel Mason (August 7, 1848) announcing ratification of the Treaty of Guadalupe Hidalgo; and in the proclamation of General Riley (June 3, 1849) calling the first constitutional convention.[7] The need to make more widely known the content of such existing local law led to the publication, by order of General Riley (July 2, 1849), of Halleck's Translation and Digest of Mexican Laws (*ante,* fn. 5), said to be "intended

[6] "The Mexican Constitution of 1844, partially adopted in Mexico, was never regarded as in force in California, nor was it known here that these laws [of March 20 and May 23, 1837] were materially modified by any decrees or orders of the Mexican Congress." (Halleck, p. XXV (*ante,* fn. 5).)

[7] In the latter proclamation it was observed, for example, that "The laws of California, not inconsistent with the laws, Constitution and treaties of the United States, are still in force, and must continue in force till changed by competent authority." (Reprinted in Browne, Debates in the Convention of California (1850), p. 3.)

as a temporary guide and assistance to the inferior officers of Government, till more complete treaties can be prepared by competent persons.'' (*Ibid.*) And the early volumes of the California Reports are replete with decisions of this court applying such local law, often as elucidated by Spanish and Mexican writers, in causes which arose in the years prior to 1850. Thus, ''Between the transfer of California to the United States, by the treaty of Guadalupe Hidalgo, and the admission of this state into the Union, no territorial government was here established. The purely municipal law of Mexico continued in force within this territory until modified or entirely changed by appropriate authority.'' (*Lux* v. *Haggin* (1886) 69 Cal. 255, 335 [4 P. 919, 10 P. 674].)

Nor did the adoption and ratification of the Constitution of 1849 operate to directly adopt nolle prosequi or even to abrogate existing local law in any material sense. It is true that most of the provisions of that Constitution were modelled on corresponding provisions of the Constitutions of Iowa, New York, and other common law jurisdictions (see Sanderson, C. J., dissenting in *Bourland* v. *Hildreth* (1864) 26 Cal. 167, 258; see generally Hunt, The Genesis of California's First Constitution (1895)) and that ''In determining the meaning of a constitutional provision, it will be presumed that those who framed and adopted it were conversant with the interpretation which had been put upon it under the constitution from which it was copied'' (*Lord* v. *Dunster* (1889) 79 Cal. 477, 485 [21 P. 865]). But the latter is a rule of construction only, which must give way before contemporary evidence of a contrary intent. Here such evidence is ample to show that in adopting the Judicial Article—or any other provision—of the Constitution of 1849 the framers did not intend thereby to substitute the common law for existing Mexican law as the rule of decision in California. This intent was made plain by the adoption of section 1 of the Schedule to the Constitution, which provided in relevant part that ''all laws in force at the time of the adoption of this Constitution, and not inconsistent therewith, until altered or repealed by the Legislature, shall continue as if the same had not been adopted.'' (Reprinted in Stats. 1850, p. 34.)

Any doubt that might otherwise exist as to the matter was set at rest by the first session of the Legislature. On April 13, 1850, that body passed an act declaring that ''The Common Law of England, *so far as it is not repugnant to or inconsistent with* the Constitution of the United States, or the Con-

stitution or *laws of the State of California,* shall be the rule of decision in all the Courts of this State." (Italics added.) (*Stats. 1850, ch. 95, p. 219.*)[8] Shortly thereafter the Legislature explicitly provided in section 630 of the Criminal Practice Act (Stats. 1850, ch. 119, p. 323) that "Neither the Attorney General, nor the District Attorney, shall hereafter discontinue or abandon a prosecution for a public offense, except as provided in the last section [§ 629, now Pen. Code, § 1385, *ante,* fn. 2]."[9]   (See also Pen. Code, §§ 1099, 1100, 1101, specifically providing immunity for a party defendant when the charge against him is dismissed by the court in order that he may be a witness either for the People (§ 1099) or for a codefendant (§ 1100).) Finally, the Legislature passed an act declaring that "all laws *now in force in the State,* except such as have been passed or adopted by the Legislature, are hereby repealed. . . ." (Italics added.) (Stats. 1850, ch. 125, p. 342.)

As the common law power of nolle prosequi was manifestly "repugnant to or inconsistent with . . . the laws of the State of California" as expressed in section 630 of the Criminal Practice Act, *supra,* it is obvious that although the Legislature adopted the common law as the general rule of decision it expressly declined to adopt that portion of the common law which vested the power of nolle prosequi in the prosecutor. Section 630 of the Criminal Practice Act was re-enacted almost verbatim by the second session of the Legislature as section 598 of the Criminal Practice Act of 1851 (Stats. 1851, ch. 29, p. 279) and that statute remained in force until superseded in 1872 by Penal Code section 1386.[10] The addition at that time of the words, "The entry of a nolle prosequi is abolished," was explanatory and confirmatory only; i.e., it

---

[8]It is interesting to note that in his message to the Legislature (December 21, 1849) Governor Burnett had recommended the adoption of the English law of evidence and the English criminal and commercial law, and the Louisiana Civil Code and Code of Practice. A petition in support of the Governor's proposal was referred to the Senate Committee on the Judiciary, which filed a report (February 27, 1850) reviewing at some length the respective merits of the civil law and the common law, and recommending adoption of the latter. (Report on Civil and Common Law, reprinted in 1 Cal. 588-604.)

[9]Sections 629 and 630 were based, respectively, on sections 671 and 672 of the New York Code of Criminal Procedure.

[10]Section 1386 provides as follows: "The entry of a nolle prosequi is abolished, and neither the attorney-general nor the district attorney can discontinue or abandon a prosecution for a public offense, except as provided in the last section."

added nothing except confirmation to the legal effect of its predecessors under the 1850 and 1851 acts for manifestly it could not then abolish that which had never existed in California.[11]

The majority's appeal to the history of England and of such states as Maine, Massachusetts, Ohio, Louisiana and South Carolina serves but to emphasize the lack of authority under California law for the Legislature's attempt to transfer a portion of the superior court's constitutionally granted jurisdiction from the judicial to the executive department of government. The question of *how* the defendant's case is decided is of little importance to anyone other that the defendant; but the question of *who* decides it—the district attorney or the court—is of major importance to all citizens as well as to the defendant, to whom it denies due process.

As hereinabove observed, the implied powers of the courts are impracticable if not impossible of all-inclusive enumeration. Yet they flow from a common source—the authority of every court "to control the proceedings before it insofar as the essentials of the judicial process are concerned" (*People* v. *Burke* (1956) 47 Cal.2d 45, 52 [6] [301 P.2d 241]). The concept of what is an essential part of the judicial process, however, is neither static in quality nor fixed in time.

[11]In this connection the majority cite *People* v. *Bruzzo* (1864) 24 Cal. 41, but the case is not relevant to the issue before us. The record there showed (*id.* at p. 51) "a case of joint indictment; joint trial; a request or call by the Prosecuting Attorney for one of the defendants for the purpose of examining him against the other two; he takes the stand voluntarily in answer to the call; he invites and without objection takes the oath in its most comprehensive form, and, under instructions which he has previously solicited, and to which he takes no exception when given, criminates his associates and himself; and on these antecedents the counsel of the witness, in pursuance of a notice previously given, moves the Court not merely to discharge the witness from the particular prosecution, *but to finally acquit him, in effect, of the crime alleged against him.*" (Italics added.) It was held that "The Court has no power to discharge Bruzzo at common law, nor under the Act of 1851 [i.e., Stats. 1851, ch. 29, p. 252, § 368, now Pen. Code, § 1099], on the motion of his own counsel." (*Ibid.*) But no such power is here in question, as the dismissal of a charge of prior conviction is effective only for sentencing purposes and does not expunge that conviction from the defendant's record. Nor is the reference in *Bruzzo* to the common law of any significance here. It cannot be taken to imply that the common law was adopted in this state by the Constitution of 1849, as it has been shown hereinabove that the fact was otherwise. And although the court in *Bruzzo* looked to the common law as well as to the statutes in search of evidence of the judicial power there under discussion, it does not follow from that fact that in the case at bench the common law power of nolle prosequi should be deemed to have somehow been adopted despite its express rejection by the first session of the Legislature.

Its scope necessarily changes as the machinery of the administration of justice changes, to meet the new conditions and needs of a developing society. To define the essentials of the judicial process exclusively in terms of the law as it stood in earlier stages of that development "would be to make of stale usage a strait-jacket confining our constitutional grants of power, and would be directly contrary to the view of the Constitution as a document expanding ' "to meet the advancing affairs of men." ' (*People* v. *Western Air Lines, Inc.* [1954] 42 Cal.2d 621, 635 [19] [268 P.2d 723].)" (*California Motor Express, Ltd.* v. *State Board of Equalization* (1955) 133 Cal.App.2d 237, 242 [5b] [283 P.2d 1063].) The real issue, therefore, is not whether the hearing and determination of the question of dismissing a charge of prior conviction was an essential part of the judicial process in 1849 or 1872 or 1879; rather, the issue is whether such hearing and determination is *today* an essential part of that process.

Only recently we had occasion to point out that "The statutory rules of pleading and procedure in criminal actions today are not only different from, but in certain aspects are contraversions of, those which existed under the Practice Act of 1851 and even under the Penal Code prior to the amendments of 1915 and 1927." (*People* v. *Tideman* (1962) 57 Cal.2d 574, 578 [1] [21 Cal.Rptr. 207, 370 P.2d 1007].) In this century alone there have been many changes in the criminal law, both substantive and procedural, which give a force and effect to a charge of prior conviction, if found to be true, that could not have been foreseen by the framers of our two Constitutions and our first codes. This effect is now felt throughout the entire judicial process. To begin with, the charging of all known prior convictions is now mandatory on the district attorney. (Pen. Code, § 969; *In re Tartar* (1959) 52 Cal.2d 250, 254-255 [1a, 2, 1b, 3] [339 P.2d 553]; see also *People* v. *Williams* (1961) 193 Cal.App.2d 394, 401 [9] [14 Cal.Rptr. 279]; *People* v. *Dunbar* (1957) 153 Cal. App.2d 478, 479 [1] [314 P.2d 517]; *People* v. *Ashcraft* (1956) 138 Cal.App.2d 820, 826 [5] [292 P.2d 676].) The finding that a defendant has suffered two or more prior convictions of certain felonies will now result in an adjudication of habitual criminality (Pen. Code, § 644), with its attendant effect in extending the minimum term of imprisonment that he must serve before being eligible for

parole (*id.*, §§ 3047-3048.5). Even if he is not adjudged an habitual criminal, a finding of prior conviction of certain felonies will now either diminish or destroy his eligibility for probation (*id.*, § 1203), and may result in a mandatory increase in the minimum term that can be fixed by the Adult Authority under the Indeterminate Sentence Act (*id.*, §§ 3020, 3023, 3024).

More particularly with respect to narcotics violations, the statutes (Health & Saf. Code, div. 10) in force at the time of defendant's conviction (5 October 1960) gave substantial effect to a finding of prior conviction. Eleven offenses were then defined in chapter 5 (''Illegal Narcotics'') of division 10 of the code, and in regard to no less than eight of them the statute provided for mandatory charging of prior narcotics convictions and for increased punishment dependent on corresponding findings (*id.*, §§ 11500, 11501, 11502, 11530, 11531, 11532, 11540, 11557). Thus, the court in the case at bench (presuming the validity of Health & Saf. Code, § 11718, *ante*, fn. 1) was compelled to deny probation (*id.*, § 11715.6)[12] and to sentence defendant to state prison for the statutorily increased term of two to twenty years, rather than the basic term of not more than one year in county jail or not more than ten years in state prison.[13]

In this connection we may take note of the fact that the difference, from the standpoint of punishment and rehabilitation, between treating a man as a first offender and giving effect to a prior conviction will be even greater under the new narcotics laws. Section 11500 was amended in 1961 (Stats. 1961, ch. 274, § 1) to provide, in the case of one prior felony narcotics conviction,[14] that the defendant ''shall be im-

---

[12]Section 11715.6 provided in relevant part as follows at the time of defendant's conviction: ''In no case shall any person convicted of [any of the narcotics offenses defined in div. 10, ch. 5, of the code] . . . be granted probation by the trial court, nor shall the execution of the sentence imposed upon such person be suspended by the court, if such person has been previously convicted of any offense described in this division [except § 11721, use of narcotics] . . .''

The 1961 amendment to section 11715.6 (Stats. 1961, ch. 274, § 12) adds references to two new narcotics offenses (§§ 11500.5 and 11530.5) but makes no substantial changes in the wording or effect of the section.

[13]Health and Safety Code section 11500, as it provided at the time of defendant's conviction.

[14]Health and Safety Code section 11504 (added by Stats. 1961, ch. 274, § 5) provides: ''As used in this article [art. 1, ''Illegal Sale, Possession, Administration and Transportation''] 'felony offense,' and offense 'punishable as a felony' refer to an offense for which the law prescribes

prisoned in the state prison for not less than five years nor more than 20 years, *and shall not be eligible for release upon completion of sentence, or on parole, or on any other basis until he has served not less than five years in prison.*" (Italics added.) In the case of two or more prior narcotics convictions the corresponding term is now from 15 years to life, with a required minimum time served of 15 years. (Ordinarily, of course, a prisoner "whose minimum term of imprisonment is more than one year, may be paroled at any time after the expiration of one-third of the minimum term." (Pen. Code, § 3049.)) The remaining sections of articles 1 and 2 of chapter 5 ("Illegal Narotics") were similarly amended (Stats. 1961, ch. 274, §§ 2-11), increasing in each instance the punishment imposed and the required minimum time served in cases of one or more prior narcotics convictions.[15]

The conclusion is inescapable that a charge of prior conviction which is found to be true now has serious and far

---

imprisonment in the state prison as either an alternative or the sole penalty, *regardless of the sentence the particular defendant received.*" (Italics added.)

[15]For convenience of reference, the following chart sets out the respective effects, under the new narcotics laws, of striking, or of not striking and finding to be true, one or more charged prior felony convictions:

| Health & Safety Code sections | Disposition of priors charged | Minimum Sentence (years) | Maximum Sentence (years) | Minimum Time served (years) |
|---|---|---|---|---|
| 11500 Simple possession (except marijuana) | Prior struck or found not true: | 2 | 10 | 2 |
| | 1 prior found true: | 5 | 20 | 5 |
| | 2 or more priors found true: | 15 | life | 15 |
| 11500.5 Possession for sale | Prior struck or found not true: | 5 | 15 | 2½ |
| | 1 prior found true: | 10 | life | 6 |
| | 2 or more true: | 15 | life | 15 |
| 11501 Sale or gift or offer to give or transport or furnish | Prior struck or found not true: | 5 | life | 3 |
| | 1 prior true: | 10 | life | 10 |
| | 2 or more true: | 15 | life | 15 |
| 11502 Sale or gift to minor | Prior struck or found not true: | 10 | life | 5 |
| | 1 prior true: | 10 | life | 10 |
| | 2 or more true: | 15 | life | 15 |
| 11502.1 Minor's sale or gift to minor | Prior struck or found not true: | 5 | life | — |
| | 1 or more found true: | 10 | life | — |

*(Footnote continued on next page.)*

reaching effects on the punishment of the offender, and hence on the possibility of his eventual rehabilitation. This being so, the hearing and determination of the important question of dismissing such a charge for the purpose of individualizing punishment and encouraging rehabilitation—which is to the ultimate benefit of society as a whole, and which chiefly distinguishes modern penology from the older concepts—must today, more importantly even than in the past, be deemed an essential part of the judicial process. And the power to hear and determine that question must, under the principles set forth hereinabove, be deemed an implied constitutional power of the courts of this state.[16]

Neither section 11718 nor section 11500 takes cognizance of the fact that there is a vast difference between the culpability of a *non-addict* possessor-pusher on the one hand, and on the other, that of the sick and impoverished addict who, desperate for the drug, pushes it in order to possess it. Trial judges—before enactment of section 11718—could recognize that difference and (by striking a charged prior in what the evidence and their experience told them was probably a

| | | | | |
|---|---|---|---|---|
| 11530 Simple possession of marijuana* | Prior struck or found not true: | 1 | 10 | 1 |
| | 1 prior true: | 2 | 20 | 2 |
| | 2 or more true: | 5 | life | 5 |
| 11530.5 Possession of marijuana for sale | Prior struck or found not true: | 2 | 10 | 2 |
| | 1 prior true: | 5 | 15 | 3 |
| | 2 or more true: | 10 | life | 6 |
| 11531 Sale or gift or import or transport of marijuana | Prior struck or found not true: | 5 | life | 3 |
| | 1 prior true: | 5 | life | 5 |
| | 2 or more true: | 10 | life | 10 |
| 11532 Sale or gift of marijuana to minor | Prior struck or found not true: | 10 | life | 5 |
| | 1 prior true: | 10 | life | 10 |
| | 2 or more true: | 15 | life | 15 |

*It may be observed that there appears to be medical opinion that marijuana is less habit forming and less toxic to the human system than is tobacco. It seems obvious, therefore, that at some later date a court may be considering some equally drastic enactment with respect to tobacco. It is not many years since we did face quite similar laws affecting possession of alcoholic beverages.

[16]I am thus in full agreement with the Committee on Criminal Law and Procedure of the State Bar of California which, in its recent report to the Board of Governors recommending that the State Bar sponsor the repeal of section 11718, gave as its opinion that "To make the prosecuting officer the only person who can move to set aside a prior conviction, takes away all judicial discretion in pronouncing sentence and is a legislative encroachment upon proper judicial power." (35 State Bar J. 432 (1960).)

deserving case) give to the Adult Authority greater scope to treat such an addict as an individual—a very sick and helpless individual, but in some cases a person who could be rehabilitated and cured.

Reference to the chart in footnote 15 makes it obvious that the need for judicial discretion (in contrast to prosecutor's zeal) may be even more important in cases wherein violation of Health and Safety Code section 11532 is charged. Under that section a youth—exactly 21 years old (with one prior charged and found true)—who shared a marijuana cigarette with another youth *one day younger,* would be absolutely required to *actually serve* 10 years in prison. With the prior struck the youth, if the Adult Authority saw fit, might be paroled after a minimum of five years served. *In either case,* it is to be noted, whether the charge of prior conviction was struck or found true, the *maximum sentence* open to the Adult Authority *is life imprisonment.* In its application to a situation of this kind section 11718, aside from being unconstitutional, is a throwback toward an abandoned concept of penology. It works at cross-purposes with the indeterminate sentence plan and objectives.

In connection with the foregoing discussion it should be remembered that the dismissal or striking from an accusatory pleading of an allegation of prior conviction does not preclude the Adult Authority from considering the fact of a prisoner's prior conviction in fixing the term of imprisonment and the time for and conditions of parole, if any. The direct and important effect of the court's dismissal or striking of the charge is to broaden the area of the Adult Authority's discretion in fixing the *minimum* term of imprisonment in deserving cases. But solicitude of the law for the protection of society against confirmed offenders makes sure that the Adult Authority shall be acquainted with all facts which may militate against early, or even any, parole. The statutes provide that: ''The Director of Corrections shall keep complete case records of all prisoners under custody of the department, . . .

''Case records shall include all information received by the Director of Corrections from the courts, probation officers, sheriffs, police departments, district attorneys . . . and other interested agencies. . . .'' (Pen. Code, § 2081.5.) Reports of court dispositions are mandatory. (Pen. Code, §§ 11115, 11116; see also Pen. Code, §§ 3020, 3024, 3041, 3046.) Furthermore

"any person who is hereafter discharged or paroled from a penal institution where he was confined because of the commission of any such [narcotics] offense . . . shall within thirty days . . . of his coming into any county or city . . . register with the chief of police . . . or the sheriff" (Health & Saf. Code, § 11850).

Just six years ago in a substantially similar context the same question was presented to us and we deliberately considered and passed on it (*People* v. *Burke* (1956) 47 Cal.2d 45 [301 P.2d 241]). We were then unanimous and we held (at p. 51 [4]) : "The power to strike or dismiss the proceeding as to a prior conviction is within the power referred to in section 1385 of the Penal Code, which provides that 'The court may, either of its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. . . .' The authority to dismiss the whole includes, of course, the power to dismiss or 'strike out' a part. . . .

"[6] The People argue that by providing in section 11712 of the Health and Safety Code that if a prior conviction, whether of misdemeanor or felony, 'is admitted by the defendant, he *shall* be imprisoned in the state prison' (italics added) the Legislature intended to take from the court the power to dismiss or strike a charge of prior conviction if the defendant admits the charge. According to the People, the trial court was required to sentence defendant to state prison and the judgment should be reversed for the purpose of directing it to do so. . . .

"[P. 52] The cited cases—and the statutes referred to—do not purport to divest the trial court (or to hold that the court constitutionally could be divested) of the power to control the proceedings before it insofar as the essentials of the judicial process are concerned; i.e., to find the defendant guilty or not guilty of any offense charged, or of a lesser included offense, or to dismiss the action *in toto* or to strike or dismiss as to any or all of multiple counts or charges of prior conviction. The statutes in question do validly—and in respect to constitutionally vested judicial power they neither purport to nor validly could do more than—prescribe the sentence which must be imposed upon the appropriate adjudication of guilt of the substantive crime and judicial determination of the factor which results in increased punishment. Such adjudication and judicial determination are inherently and essentially the province of the court even as the punishment

which may or must follow the offense adjudicated, either with or without a punishment augmentation factor, is essentially for the Legislature except as it may vest an area of discretion in the court or administrative body. (See *People* v. *Gowasky* (1927) 244 N. Y. 451 [155 N. E. 737, 749, 58 A.L.R. 9, 17].)'' (See also *People* v. *Benjamin* (1957) 154 Cal.App.2d 164, 173 [15] [315 P.2d 896]; *People* v. *Green* (1957) 152 Cal.App.2d 886, 891 [6] [313 P.2d 995]; *People* v. *Harris* (1956) 146 Cal.App.2d 142, 147-148 [7] [304 P.2d 178].) And only five years ago, again unanimously, in *People* v. *Valenti* (1957) 49 Cal.2d 199, 206 [9] [316 P.2d 633], we further recognized that a charge of prior conviction may be dismissed by the court "in the exercise of [its] inherent power to control the proceedings before it," and that section 1385 is merely "evidential of" that power.

The broad scope of the judicial power in this area of its jurisdiction, although sometimes attacked by zealous prosecutors, has not been seriously doubted until today. As the District Court of Appeal said in *People* v. *Superior Court* (1921) 53 Cal.App. 185, 186 [199 P. 840] (relying on this court's decision in *People* v. *More* (1886) 71 Cal. 546 [12 P. 631]), "We think that respondent [superior court] has jurisdiction to dismiss the action for any reason that it determines to be in furtherance of justice." To the same effect is *People* v. *Martin* (1924) 70 Cal.App. 271, 276 [6] [233 P. 85]: "The action of the trial court on such a motion [to dismiss under Pen. Code, § 1385] is discretionary." In *People* v. *Smith* (1925) 76 Cal.App. 105, 111 [5] [243 P. 882], the court declared: "At most, the motion [by the district attorney] for a dismissal is merely a recommendation to the court. If the court, for any reason, differs with the district attorney . . . there can be no doubt that the court has a full right to refuse such dismissal." And in *People* v. *Ward* (1890) 85 Cal. 585, 590 [24 P. 785], we held, "It is clear . . . 'the court' alone has the power to dismiss a criminal action."

The Legislature may enact reasonable regulations to be observed in carrying out the constitutional functions of the courts (such as prescribing the records to be kept and the procedure by which jurisdiction is to be exercised) "provided they do not defeat or materially impair the exercise of those functions." (*Brydonjack* v. *State Bar* (1929), *supra*, 208 Cal. 439, 444 [4].) Here, it is apparent that the effect of Health and Safety Code section 11718 was to utterly defeat the exercise by the trial court of the above delineated judicial

function. The court felt that it had "no discretion," and that the statute "tied the hands" of the court. It follows that section 11718 effectively deprived defendant of his constitutional right to a "judicial determination of the factor which results in increased punishment" (*People* v. *Burke* (1956), *supra*, p. 52 [6] of 47 Cal.2d), and hence denied him due process of law in the important matter of probation and sentencing. (U.S. Const., 5th and 14th Amends.; Cal. Const., art. I, § 13.)

Furthermore, it is to be noted, the jurisdiction held by the majority to be excised by force of Health and Safety Code section 11718 is not only the original jurisdiction of the superior court but also the potential appellate jurisdiction of this court. In *People* v. *Valenti* (1957), *supra*, 49 Cal.2d 199 207, we specifically approved the holding in the *Burke* case that the trial court's order striking the allegation of prior conviction "was appealable, not because it was made 'in furtherance of justice,' but because, as we there stated (p. 53 [8] of 47 Cal.2d) it 'was in its nature one of the orders specified as appealable either by paragraph 1 or by paragraph 6 of section 1238 of the Penal Code. That statute provides that the People may appeal "1. From an order setting aside the indictment, information or complaint; . . . 6. From an order modifying the verdict or finding by reducing the degree of the offense or the punishment imposed." The trial court's action was in substance "an order setting aside [a part of] the . . . information." ' Since the *Burke* case order did not involve either the cause of action itself or any question of jeopardy it was clearly proper to hold, as we did, that it 'was in substance "an order setting aside [a part of] the . . . information" ' and, consequently, that as to appealability it should be governed by the rules applicable to orders setting aside the information rather than by those applicable to orders dismissing the action." Thus it is established law that if the district attorney feels that the trial court has abused its discretion or erred in an order setting aside or striking a part of an accusatory pleading the remedy of appeal is available. But if, as the majority today hold, section 11718 effectively transfers to the district attorney unreviewable authority to compel the trial court to deny the motion—or to not even consider and pass on it—then indeed is the defendant denied due process both in the trial court and (to resist on plaintiff's appeal) in this court.

## The Separation of Powers

Article III, section 1, of the California Constitution provides—as it has provided in substance since adoption of our first Constitution (i.e., since 1849)—that "The powers of the government of the State of California shall be divided into three separate departments—the legislative, executive, and judicial; and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to either of the others, except as in this Constitution expressly directed or permitted." It is my view that section 11718 of the Health and Safety Code is unconstitutional for the further reason that, both on its face and as here applied, it violates this requirement of separation of powers by subjecting the exercise of an inherently judicial function to the unfettered and unreviewable discretion of the district attorney, a member of the executive branch of government.

It will be remembered that section 11718 (*ante*, fn. 1) prohibits the trial court from hearing and determining the question of whether a charge of prior conviction should be dismissed, "except upon motion of the district attorney." Under this statute, no matter how deserving the individual case may be for judicial action, the court must wait upon the permission of the district attorney before proceeding further, and if such permission is not forthcoming the court's hands are "tied" and it cannot act. As defendant correctly points out, "The court is precluded from exercising its judgment in a fact situation before it, unless the district attorney gives the judicial prerogative what might be termed a 'prior approval.'" To endow a member of the executive department with such a power is in effect to authorize him, in the language of article III, section 1, to "exercise" one of the "functions appertaining to" the judicial department.

It is true, of course, that in the complex state of modern government the principle of the separation of powers should not be treated as absolute, and that each branch of government must of necessity and in some degree exercise certain functions of the others. But that principle nevertheless requires, when a judicial function is exercised by a member of the executive branch, that ultimate control over its exercise be retained by the courts through the medium of judicial review. Much of the increasingly elaborate structure of our administrative agencies, as is well known, has been erected and sustained upon

this foundation. Under the subject statute, however, a decision of the district attorney not to initiate a motion to dismiss is not reviewable by any court in any type of proceeding. Thus, on the present appeal, we cannot review the propriety of the district attorney's decision itself, but must confine ourselves to examining the authority under which it was made. Indeed, even in a case where, for example, the prior narcotics offense occurred a half century earlier and the defendant successfully served a period of probation, was rehabilitated and became a useful member of society, the district attorney would not be judicially accountable for a refusal to allow the trial court to consider dismissing the charge of the old conviction and treating the defendant as a first offender. Section 11718 is therefore invalid for this reason also, as nonreviewable or ultimate judicial power may not constitutionally be delegated to a member of the executive department. (Cal. Const., art. III, § 1; *Laisne* v. *California State Board of Optometry* (1942) 19 Cal.2d 831, 835 [3] [123 P.2d 457].)

Nor can it be presumed that the district attorney will act with judicial impartiality in exercising this power. The majority assert (*ante*, p. 651) that ''The Legislature is authorized to provide that part of the powers that might otherwise be exercised by the Adult Authority alone shall be exercised by district attorneys.'' But the Adult Authority has nothing whatsoever to do with the judicial process leading to entry of judgment. It has no power to superintend the trial of cases in the courts or to participate in any way in the determination of the guilt or innocence or the scope of the judgment of conviction of any person who is brought to trial in the superior court on a charge of felony. Manifestly the power of the Legislature to provide for the administration of prisons and prisoners is not the equivalent of authority to transfer a judicial function to the executive department.

The proposition asserted by the majority is based on article X, section 1, of our Constitution, which provides in relevant part that ''the Legislature may delegate the government, charge and superintendence of [state prisons] to any public governmental agency or agencies, officers, or board or boards. . . .'' In enacting section 11718, say the majority, ''the Legislature in the exercise of its [just quoted] constitutional power has simply chosen one public officer rather than another.'' (*Ante*, p. 652.) It appears to me that this contention lacks substance as support for the majority's essential conclusion that the Legislature effectively transferred from the superior

court judge to the district attorney the jurisdiction to adjudicate this phase of the criminal action against defendant. To authorize the prosecutor to sit in final judgment on the resolution of one of the substantial issues in the case of *People* v. *Sidener* while this case was on trial in the superior court is, in my opinion, flagrantly to disregard the painfully learned truths which are the very foundation of our constitutional system of government. If indeed the Legislature has here "simply chosen one public officer rather than another," the choice is not only a dangerous and unwise one—it nakedly violates the letter and spirit of both the Constitution of California and the Constitution of the United States.

If Health and Safety Code section 11718, in seeking to secure its objective, went one step further and declared that no application to the Governor for pardon, or commutation of sentence, imposed for a narcotics offense "may be" granted "except upon motion of the district attorney," would such transfer of jurisdiction even from one executive officer to another in the same department of government be sustained? The vesting in the Governor of the constitutional powers of pardon and commutation, subject to control in certain situations by the Supreme Court, is no more exclusive than is the vesting of judicial power in the constitutional courts.

I am not unmindful of our duty to so construe legislation as to save its constitutionality if that can reasonably be done (*Erlich* v. *Municipal Court* (1961) 55 Cal.2d 553, 558 [1] [11 Cal.Rptr. 758, 360 P.2d 334] ; *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 839 [11] [313 P.2d 545] ; *Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 60 [5] [195 P.2d 1]), but in my view section 11718 of the Health and Safety Code admits of no doubt either as to its meaning or as to its effect. In these circumstances "the duty of the court is plain, and should be fearlessly performed." (*Van Harlingen* v. *Doyle* (1901) 134 Cal. 53, 56 [66 P. 44, 54 L.R.A. 771] ; cf. *City of Los Angeles* v. *Offner* (1961) 55 Cal.2d 103, 113 [7] [10 Cal.Rptr. 470, 358 P.2d 926].)

Apart from principle the step taken by the majority today may not be a big step. But in principle it is indubitably a step toward totalitarian concentration of power in the executive; a power to be exercised without any legislative standard and without possibility of judicial review. As applied here it deprives the defendant of due process and of equal protection of the law.

The judgment should be reversed and the cause remanded

for *judicial* determination, which in the circumstances means for redetermination in the light of the views herein expressed, of the question of dismissal of the charge of defendant's prior conviction, and for pronouncement of a new (but not necessarily different) judgment in accordance with such determination.

McComb, J., concurred.

WHITE, J., Dissenting.—I am in accord and concur with the historical narrative and legal reasoning contained in the dissenting opinion prepared by Mr. Justice Schauer.

While the Legislature is empowered to place certain reasonable restrictions upon constitutional functions of the courts, nevertheless, as pointed out by Mr. Justice Schauer, the legislative prerogative in that regard is limited to such restrictions as "do not defeat or materially impair the exercise of those [judicial] functions." And, as recently as 1956, in *People* v. *Burke,* 47 Cal.2d 45 [301 P.2d 241], this court held that the determination of the factor which results in the imposition of increased punishment is inherently vested in the courts.

I view with alarm this invasion of the powers of the judicial department of government by the legislative department. If the power of the courts, in the interest of justice, to control the dismissal of a prior conviction can be made subject to the approval of the district attorney, then what is to prevent the Legislature from providing that the finding as to whether an allegation of a prior conviction is true or untrue under the laws of this state shall also be vested in the district attorney? I sometimes think we are inclined to forget that under our philosophy of government the district attorney is but the representative of just another litigant in a criminal prosecution. He is invested with the power to institute prosecutions but once he has done so, the determination of the truth or falsity of such accusations is for the courts.

Another alarming feature of the statute here under consideration is that, as pointed out by Mr. Justice Schauer, it takes away all judicial discretion in the pronouncement of sentence and invests the district attorney with plenary power to control the pronouncement of judgment *without any right of judicial review.*

Such an enactment under the American way of life seems to me the very essence of slavery and a return to the philosophy of "the Divine Right of Kings." After all, the district

attorney cannot be regarded as impartial. He is essentially an advocate who, believing in the justice of his cause, is seeking conviction and punishment of the accused. To make him also the court of last resort as to what punishment should be imposed, without any impartial tribunal to review his decision in the matter of sentencing, seems to me to do violence to our concept of constitutional government, and offends our oft repeated and proud boast that we are a government of law and not of men.

I regard section 11718 of the Health and Safety Code, now engaging our attention, as a legislative encroachment upon proper judicial power and therefore, unconstitutional.

I would reverse the judgment and remand the cause to the court below for further proceedings as set forth in the last paragraph of the dissenting opinion of Mr. Justice Schauer.

McComb, J., concurred.

Appellant's petition for a rehearing was denied November 21, 1962. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.